UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTOPHER ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:23-cv-00596-JPH-TAB |
| | ) |
| JESSICA HEATHERLY Sgt., | ) |
| M. SUMMERS Officer, | ) |
| DIALLO Officer, | ) |
| SHIVELY Officer, | ) |
| ANGELA REYNOLDS LPN, | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Christopher Rogers, who is incarcerated by the Indiana Department of Correction ("IDOC"), alleges that Defendants[1] were deliberately indifferent to his suicidal condition when he was at Pendleton Correctional Facility. Before the Court are motions for summary judgment filed by Defendants Jessica Heatherly, Meghan Sommers, Souleymane Diallo, and Heath Shively ("the IDOC Defendants"), and Defendant Angela Reynolds. Mr. Rogers has also filed a motion for summary judgment. For the reasons below, Mr. Rogers's motion, dkt. [55], is **DENIED**, Defendant Reynolds's motion is **DENIED**, dkt. [47], and the remaining Defendants' motion, dkt. [57], is **DENIED** as to Sergeant Heatherly and Officer Diallo and **GRANTED** as to Officers Sommers and Shively.

---

[1] The **clerk is directed** to correct the names of Defendant M. Summers to "Meghan Sommers, " Defendant Diallo to "Souleymane Diallo," and Defendant Shively to "Heath Shively" on the docket.

# I.
# Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered

2

undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson,* 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz,* 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150, AFL-CIO,* 335 F.3d 643, 647 (7th Cir. 2003).

## II.
## Factual Background

### A. The Parties

At the time of the incident, Mr. Rogers was incarcerated at Pendleton and housed in G Cell House. Dkt. 57-1 at 18.

Angela Reynolds is a Licensed Practical Nurse ("LPN") and was employed at Pendleton by Centurion, a private company that contracts with the IDOC to provide medical services to inmates. Dkt. 47-1 at 1.

Jessica Heatherly was a Correctional Sergeant at Pendleton and assigned to G Cell House. Dkt. 57-2 at 1–2. She was the direct supervisor of the Correctional Officers assigned to G Cell House. *Id.* at 2.

Meghan Sommers was a Correctional Officer at Pendleton and assigned to G Cell House. Dkt. 57-3 at 1. Souleymane Diallo was a Correctional Officer at Pendleton and assigned to G Cell House, specifically on Mr. Rogers's range.

3

Dkt. 57-5 at 1. Heath Shively was a Correctional Officer at Pendleton and assigned to G Cell House, specifically on the floor directly below Mr. Rogers's range. Dkt. 57-4 at 1.

### B. Pendleton Operations

G Cell House is a disciplinary segregation housing unit. Dkt. 57-1 at 22. As such, inmates housed in G Cell House are not permitted to keep razor blades in their cells. Dkt. 57-2 at 3.

When there is a medical issue with an inmate, Correctional Officers are expected to report it to the Correctional Sergeant, who then addresses the situation. Dkts. 57-1 at 32; 57-2 at 2. Correctional Officers may call emergency signals over radio and remove inmates from their cells with restraints, but they must first inform the Correctional Sergeant that they will be doing so. Dkt. 57-4 at 2.

### C. Events of January 22, 2023

On January 22, 2023, around 9:30 to 10:00 a.m., Mr. Rogers told Officers Sommers and Diallo that he needed to see mental health because his mother had recently passed away and he "was having a mental breakdown," "was feeling like hurting [himself]," and was suicidal. Dkt. 57-1 at 39, 69. Officers Sommers and Diallo reported Mr. Rogers's request for mental health treatment to Sgt. Heatherly. *Id.* at 40.

An hour or so later, Officer Diallo came to Mr. Rogers's cell with his lunch. *Id.* at 47. Mr. Rogers asked for an update on when he would see mental

4

health. *Id.* Officer Diallo responded that he did not know when he would be sent over but confirmed he had told Sgt. Heatherly about the request. *Id.*

Throughout the day, when Officer Diallo passed by Mr. Rogers's cell, Mr. Rogers would follow up on his request. *Id.* Officer Diallo continued to respond that he had informed Sgt. Heatherly, but that Sgt. Heatherly was "refusing to come up here." *Id.* at 40, 48.

Around 3:30 p.m., Nurse Reynolds walked through Mr. Rogers's range to pass out medication to inmates. *Id.* at 72; dkt. 47-1 at 2. Mr. Rogers stopped her and told that he was being denied mental health, that Officer Diallo had repeatedly told Sgt. Heatherly that he needed to see mental health and she kept refusing to come up, and that he was feeling suicidal. Dkt. 57-1 at 73; dkt. 47-1 at 2. He asked Nurse Reynolds to "let your other staff know that I'm being denied mental health." Dkt. 57-1 at 72. She wrote down Mr. Rogers's name, DOC number, and cell location. *Id.*

Approximately half an hour later, Mr. Rogers heard Sgt. Heatherly on the bottom range, two floors below his cell. *Id.* at 70. He yelled down to let her know that he was suicidal and needed mental health because he was having a mental breakdown. *Id.* at 50, 70. She responded, "when I have time." *Id.* at 51, 70.

About an hour later, when officers began their 5:00 p.m. walks to conduct count, Mr. Rogers heard Officer Shively on the floor below him. *Id.* at 51. He again yelled that he needed to see mental health. *Id.* Officer Shively replied that he should "just be cool for a minute. Your officer's about to walk."

5

*Id.* Around ten to fifteen minutes later, Officer Diallo walked past Mr. Rogers's cell. *Id.* Mr. Rogers again stopped Officer Diallo and asked what was delaying him from seeing mental health. *Id.* Officer Diallo reiterated that he had told Sgt. Heatherly multiple times. *Id.* at 76.

Mr. Rogers then picked up a razor blade and cut his arm, from his wrist to his elbow, three times. *Id.* at 77. He testified that he did so because he felt that was the only way he could see mental health. *Id.* at 76 ("And I was like, 'Okay. If this is what I got to do to get – to see mental health, you know what I mean?'"). Officer Diallo asked Mr. Rogers to stop harming himself when he first picked up the razor and then called for medical assistance once he saw that Mr. Rogers was bleeding. *Id.* at 77. A few minutes later, Sgt. Heatherly arrived, placed Mr. Rogers in restraints, and sent him to medical. *Id.* at 41, 77.

Mr. Rogers was returned to his cell around 6:00 p.m. *Id.* at 78.

## III.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show

6

'(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). The defendants do not dispute that "suicide is an objectively serious medical condition," dkt. 58 at 9–10, so the Court proceeds to the subjective component. *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020).

In cases involving suicide or attempted suicide, "the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. This requires more than mere or gross negligence, but less than purposeful infliction of harm." *Lisle v. Welborn*, 933 F.3d 705, 716–17 (7th Cir. 2019) (cleaned up).

### A. Correctional Officers

The Correctional Officers argue that they are entitled to summary judgment because there isn't designated evidence that any one of them intentionally disregarded a known risk that Mr. Rogers may try to harm himself.

#### 1. Officer Sommers

Officer Sommers had one interaction with Mr. Rogers on the day of the incident, around 9:30 or 10:00 a.m., when she was with Officer Diallo. *Id.* at 39-40. Mr. Rogers told them that he needed to see mental health because he was having a mental breakdown due to his mother's death and felt suicidal. *Id.*;

*id.* at 69. Officer Sommers does not recall this interaction with Mr. Rogers. Dkt. 57-4. It's undisputed that Mr. Rogers's request was communicated to Sergeant Heatherly either by Officer Sommers or Officer Diallo. Dkt. 57-2 at 2; dkt. 57-1 at 39–40.

The designated evidence shows that Officer Sommers had one interaction with Mr. Rogers and that during that interaction, Mr. Rogers said he needed mental health treatment and was suicidal. This information had been relayed to Sergeant Heatherly as required by IDOC policy. Dkts. 57-1 at 42-43; 57-4 at 2. It was therefore reasonable for Officer Sommers to take no further action. From the designated evidence, no reasonable jury could conclude that Officer Sommers intentionally disregarded a known risk that Mr. Rogers would harm himself. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).

As such, Officer Sommers is entitled to summary judgment.

### 2. Officer Shively

Mr. Rogers had only one interaction with Officer Shively—in the late afternoon, he yelled to Officer Shively that he was suicidal and needed mental health. Dkt. 57-1 at 51, 74. Officer Shively responded that he should stay calm because his assigned officer, Officer Diallo, would be walking by shortly. *Id.* Shortly thereafter, Officer Diallo arrived at Mr. Rogers's cell. *Id.* Like Officer Sommers, Officer Shively had one interaction with Mr. Rogers and reasonably believed that other officers would see to it that Mr. Rogers received mental health care. From the designated evidence, no reasonable jury could conclude

8

that Officer Shively intentionally disregarded a risk that Mr. Rogers would harm himself. Officer Shively is entitled to summary judgement.

### 3. Officer Diallo

Officer Diallo was assigned to Mr. Rogers's housing range on the day of the incident. After initially informing Officer Diallo round 9:30 or 10:00 a.m. that he needed to see mental health, was having a mental breakdown due to his mother's death, and was suicidal, dkt. 57-1 at 39, Mr. Rogers repeatedly asked Officer Diallo throughout the day about his request to see mental health. Dkt. 57-1 at 39, 47, 51.

Officer Diallo told Mr. Rogers that he had relayed his request to see mental health to Sgt. Heatherly as required by IDOC policy—Officer Diallo did not have authority to send Mr. Rogers to mental health. *Id.* at 42-43, 47, 76. It's undisputed that Officer Diallo told Sgt. Heatherly that Mr. Rogers needed to be seen by mental health. A jury could find from the designated evidence, however, that Officer Diallo knew that Mr. Rogers did not receive any mental health care over the course of the day. *See* dkt. 57-1 at 40 ("[Officer Diallo] just kept telling [Mr. Rogers] 'I told Heatherly, but she's refusing to come up here.'").

Shortly after 5:00 p.m.—seven or eight hours after Mr. Rogers had first informed Officer Diallo that he needed to see mental health and felt like harming himself—Officer Diallo saw that Mr. Rogers had cut himself with a razor blade and then called for medical assistance. *Id.* at 77, 80.

Officer Diallo argues that he could not have inferred that there was a substantial risk of harm to Mr. Rogers because he was not aware that Mr.

9

Rogers had a razor when he was threatening self-harm and suicide. Dkt. 58 at 13; dkt. 57-5 at 2. It was not reasonable, however, for Officer Diallo to think that Mr. Rogers could not harm himself just because he didn't have a razor blade. Officer Diallo also argues that he was not deliberately indifferent to the substantial risk to Mr. Rogers because as a correctional officer, he was not responsible for providing mental health treatment to inmates. Dkt. 58 at 11. While it's true that notifying medical personnel will often relieve a prison guard of further responsibility for an inmate's medical care, "prison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (citing *Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019)).

And here, a reasonable jury could find that Officer Diallo knew as of 9:30 or 10:00 a.m. that Mr. Rogers felt suicidal, and knew that Mr. Rogers did not receive mental health care throughout the day yet took no further action to get Mr. Rogers treatment. From that finding, a jury could conclude that Officer Diallo was deliberately indifferent to a known serious risk of self-harm to Mr. Rogers. *See Arnett v. Webster*, 658 F.3d 742, 755–56 (7th Cir. 2011) (a prison official may still be liable if aware of a substantial health risk to an inmate, and aware that medical staff are not providing necessary treatment).

Last, Officer Diallo argues that he is entitled to summary judgment because Mr. Rogers has not shown a recoverable injury or damages. He argues that Mr. Rogers's injuries are similar to the injuries sustained by the plaintiff in *Lord v. Beahm*, which the Seventh Circuit noted were "trivial—indeed, almost

nonexistent" as they were so minor. 952 F.3d at 905. Here, the designated evidence is that Mr. Rogers cut himself from wrist to elbow three times. Dkt. 57-1 at 77. The cuts were not actively bleeding when he arrived at the infirmary and did not require stitches, but left scars. *Id.* at 77, 114–16. It's not clear, however, that Mr. Rogers's physical injuries were as minor as those discussed in *Lord*. And this case is further distinguished from *Lord* where the Court described the inmate's suicide threat as "insincere" and motivated by the inmate's desire for attention. Here, Defendants do not dispute the sincerity of Mr. Rogers's claim that he was experiencing a serious mental health event due to his mother's death. From the designated evidence, a jury could therefore find that Mr. Rogers suffered a cognizable harm. *Lord*, 852 F.3d at 905; *see also Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016).

Accordingly, Officer Diallo is not entitled to summary judgment.

### B. Sergeant Heatherly

Officer Diallo told Mr. Rogers that Sgt. Heatherly refused to respond to his reports of Mr. Rogers's requests. Dkt. 57-1 at 76 ("That's when [Officer Diallo] responded and was like, 'Well, I told [Sergeant] Heatherly multiple times. She just refuses to come up here.'"). Then, around 4:00 p.m., Mr. Rogers heard Sgt. Heatherly walking two floors below his cell range and yelled down that he was suicidal and needed mental health. Dkt. 57-1 at 70. Sgt. Heatherly responded, "when I have time." *Id.* at 72. She did not visit Mr. Rogers's cell until approximately an hour later, when Officer Diallo called for emergency assistance after Mr. Rogers cut himself with a razor. *Id.* at 77; *see* dkt. 57-2.

11

Sgt. Heatherly testified that, when officers told her that Mr. Rogers needed to see mental health, she "promptly used [her] radio to call the medical unit" and informed them of his request. Dkt. 57-2 at 2. Mental health staff then "directed [her] to keep Mr. Rogers in his cell" and told her that "mental health staff would come to Mr. Rogers' [cell] to assess him cell-side." *Id.* Sgt. Heatherly does not specify whether this call took place in the morning, when Mr. Rogers first asked Officers Sommers and Diallo about seeing mental health, or at some point later in the day. *See* dkt. 57-2. There is also no designated evidence showing that Sgt. Heatherly thought that mental health staff did come to see Mr. Rogers. And it would be reasonable to infer, based on Officer Diallo repeatedly telling her that Mr. Rogers was still requesting mental health, that Sergeant Heatherly was aware that mental health staff never came to see Mr. Rogers. *See* dkt. 57-1 at 76.

Like Officer Diallo, Sgt. Heatherly argues she was unaware that Mr. Rogers had a razor blade in his cell, that Mr. Rogers's injury was not cognizable, and that it was not her responsibility to provide mental healthcare to him. Dkt. 58 at 11, 13. These arguments fail for the same reasons as discussed for Officer Diallo, *supra.* She also argues that she was entitled to rely on the direction of mental health staff when they told her to leave Mr. Rogers in his cell. Prison guards and officials generally may defer to medical staff to tend to inmates' medical needs without fear of liability for doing so. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). At the same time, "prison officials

12

cannot intentionally disregard a known risk that an inmate is suicidal." *Lord*, 952 F.3d at 905.

Here, a reasonable jury could find from the designated evidence that Sgt. Heatherly was deliberately indifferent to the known risk that Mr. Rogers may harm himself. She first became aware of Mr. Rogers's need to see mental health around 9:30 or 10:00 a.m., knew that medical staff never came to see Mr. Rogers, and when she heard Mr. Rogers say he was suicidal at approximately 4:00 p.m., she responded, "when I have time," and did not come to his cell until an hour or so later, when Mr. Rogers had already cut himself.

### C. Nurse Reynolds

Mr. Rogers had one interaction with Nurse Reynolds on the day of the incident, when he stopped her while she was passing out medication to inmates around 3:30 p.m. Dkt. 57-1 at 72. Mr. Rogers told her that he was suicidal and that his repeated requests for mental health care had been denied or ignored. *Id.* In response, Nurse Reynolds wrote down Mr. Rogers's name, DOC number, and cell location. The record does not reflect, however, that Nurse Reynolds did anything with this information or otherwise took steps to get Mr. Rogers care. *See id.* at 73.

Nurse Reynolds does not remember this interaction. Dkt. 47-1 at 3. She argues, however, that it was not her responsibility to respond to his request or escalate his concern because her sole responsibility during medication pass is to hand out medication. *See id* at 3–4. She further argues that Mr. Rogers

13

could have notified custody staff so that they could in turn notify medical or mental health staff. *Id.* at 3.

From the designated evidence, however, a reasonable jury could conclude that Nurse Reynolds knew that Mr. Rogers was suicidal and being denied mental health care despite having notified custody staff, but took no action in response. *See id.* at 73. A reasonable jury could conclude, based on those facts, that Nurse Reynolds was subjectively aware of a known risk of harm, and deliberately disregarded that risk. *See Lord*, 952 F.3d at 905; *Arnett*, 658 F.3d at 755–56; *Berry*, 604 F.3d at 443–44. She is accordingly not entitled to summary judgment.

## IV.
## Mr. Rogers's Motion for Summary Judgment

Mr. Rogers filed a motion for summary judgment. Dkt. 55. While this filing mentions an "accompanying brief," no brief was submitted with the motion. Rather, his filing states that "taking the facts in light favorable to Plaintiff the Jury could find that the Defendants was deliberately indifferent" and includes exhibits relating to other conduct reports involving Sgt. Heatherly and medical records from the incident.

As explained above, Sgt. Heatherly, Nurse Reynolds, and Officer Diallo are not entitled to summary judgment, while Officers Sommers and Shively are entitled to summary judgment. Therefore, Mr. Rogers's motion for summary judgment is **DENIED** to the extent that his claims against Sgt. Heatherly, Nurse Reynolds, and Officer Diallo may proceed to trial, but Officers Sommers and Shively are entitled to summary judgment.

## V.
## Conclusion

Mr. Rogers's motion for summary judgment, dkt. [55], is **DENIED**. Defendant Reynolds's motion for summary judgment, dkt. [47], is **DENIED.** The remaining defendants' motion for summary judgment, dkt. [57], is **DENIED** as to Sgt. Heatherly and Officer Diallo, and **GRANTED** as to Officers Sommers and Shively.

The **clerk is directed** to correct the names of the following defendants on the docket: (1) "M. Summers" shall be corrected to "Meghan Sommers", (2) "Diallo" shall be corrected to "Souleymane Diallo", and (3) "Shively" shall be corrected to "Heath Shively". The **clerk is directed** to terminate Defendants Shively and Sommers from the docket.

The Court prefers that Mr. Rogers be represented by counsel for the remainder of this action, and Mr. Rogers's motion for counsel is therefore **GRANTED**. Dkt. [69]. The **clerk is directed** to send Mr. Rogers a motion for assistance recruiting counsel with his copy of this Order. Mr. Rogers has **until April 28, 2025**, to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**SO ORDERED.**

Date: 3/26/2025

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CHRISTOPHER ROGERS
181678
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All electronically registered counsel